UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

MATTHEW DEMAREE, et al.,

          Plaintiffs,

-against-                                                    22 Civ. 8772 (CM)(SN)

THOMAS CASTRO, et al.,

          Defendants.

———————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/4/2023

## DECISION AND ORDER GRANTING DEFENDANTS'
## MOTION TO DISMISS THE FIRST AMENDED COMPLAINT AND GRANTING IN
## PART AND DENYING IN PART DEFENDANTS' MOTION FOR SANCTIONS

McMahon, J.:

This RICO case was filed on behalf of 118 individual Plaintiffs (with more supposedly

waiting in the wings). The complaint alleges that Defendants, having formed an enterprise, offered

a product (known as Slidenjoy, a/k/a Protabl) for sale, and took orders for said product over the

internet in two different ways. However, they neither delivered a single item to the purchasers nor

refunded any of the money they received. The case is not a class action.

The ten Defendants here sued—some of whom have been served with process, some

apparently not[1]—move to dismiss on a variety of grounds.

Because this is a simple breach of contract case—or, rather, 118 simple breach of contract

cases—Plaintiffs' RICO claims are dismissed. The consequences of that dismissal will be

discussed at the conclusion of this opinion.

---

[1]    It appears that all the Defendants are moving to dismiss the complaint, whether the docket shows that they have
been served or not. All of the Defendants are foreigners, but none of them has asserted that whatever method was
used to serve them failed to comply with the law. As far as I am concerned, all Defendants have waived any
defects in service and have appeared in this action.

## STATEMENT OF FACTS

The following facts are alleged in the First Amended Complaint.

### I.     Parties to this Lawsuit

The plaintiffs are alleged to be "purchasers of the Product" (Slidenjoy). FAC ¶ 6. A few,

16 or 17, of them "purchased" the Slidenjoy in that it was the reward to which they were entitled

for contributing to a Kickstarter campaign used to fund development of the Product; they are

referred to as "Backer Plaintiffs". Dkt No. 26, 4; FAC, Schedule A. The rest of the Plaintiffs[2] are

alleged to have ordered and paid for the Product through a Canadian cloud server platform,

OVHcloud, which hosted the company's webpage. I will refer to them as the "Purchaser

Plaintiffs."[3] All Plaintiffs are suing as individuals, not as members of a class.

Among the many defects in the FAC is its failure to allege, in the body of the complaint,

the citizenship of the Plaintiffs. Per Schedule A to the FAC and the attached declarations, 72 of

the 118 Plaintiffs reside in countries other than the United States. The state of residence for only

two United States plaintiffs is specifically stated in Schedule A. The plaintiffs whose states can be

identified through exhibits are: Denise Yelvington (Florida), Alex Yohn (West Virginia), George

---

[2]     It is not clear how many plaintiffs there are in this lawsuit. Defendants think they have identified a total of 127 (16 who contributed to the Kickstarter campaign and 111 who ordered the product over the internet). Dkt No. 26, 4. However, only 118 plaintiffs are listed on Schedule A attached to the FAC. I cannot tell from Schedule A and the pleadings whether 16 or 17 plaintiffs made Kickstarter contributions. That would mean there are 102 or 101 plaintiffs who ordered over the internet. In the end the lack of a precise number of plaintiffs is not important to the resolution of the motion to dismiss.

[3]     For a large number of Plaintiffs (primarily the overwhelming number of Purchaser Plaintiffs, not Backer Plaintiffs), there does not appear to be a domestic injury, which is required to recover under § 1964(c). *RJR Nabisco, Inc. v. Eur. Cmty.* 579 U.S. 325, 354 (2016). The majority of Plaintiffs are foreigners who did business with a Belgian corporation over a Canadian website; it is unlikely that these Plaintiffs could ever allege a viable claim. *Yegiazaryan v. Smagin*, 599 U.S. 533, 543–45 (2023). However there are enough domestic Plaintiffs, both Backer and Purchaser Plaintiffs, so that at least some domestic injury was suffered, which necessitates taking a hard look at whether that injury qualifies as RICO injury. As will be seen, it does not.

Taylor (Arizona), Matthew Mickle (North Carolina), Daniel MacDonald (Texas), Matthew P. Demaree (Virginia), Scott W. Williams III (North Carolina), Calvin Jose (New York), Benjamin Mahoney (Illinois), and Timothy Leung (Wisconsin, or perhaps New York).

The Defendants are 120 Pixels (a Belgian corporation), together with eight individuals who work for that company. This includes the three founders, Castro, Wery, and Jeunehomme, (two who have been served with process, one who has not) and five other persons (four of whom, according to what appears on the docket sheet, have also not been served with process). Dkt No. 26, 5; Dkt No. 37, 7. All eight of these individuals are alleged to be Belgian citizens who reside in Europe. FAC ¶¶ 9–16. Also named as a Defendant (and, apparently, served) is a separately incorporated company, SNJ S.A. Per the FAC, SNJ is a Luxembourg corporation, also founded by Castro, Wery and Jeunehomme. FAC ¶ 30.

Two entities not named as Defendants are alleged to be RICO persons. Kickstarter is an online funding platform. It offers a well-known crowdfunding platform on which individuals can create webpages to seek development funding for their projects.

OVHcloud is a Canadian-based internet service provider, on which retailers can create their own websites that are stored on the platform's servers. The FAC alleges that 120 Pixels had a website hawking the Slidenjoy on OVHcloud.

## II.    Basic Allegations of the FAC

In 2015, a Belgian company named 120 Pixels SPRL, which was founded by Individual Defendants Laurent Wery, Charlee Jeunehomme and Thomas Castro, launched a crowdfunding campaign on Kickstarter.com. FAC ¶ 29. The Kickstarter campaign was to raise money for a

3

portable device that multiplies the working space of a common laptop by two additional screens, which slide out of the computer's case. FAC ¶ 2. That device is the afore-mentioned Slidenjoy.

In the section of the FAC entitled "predicate acts," (FAC ¶¶ 36–50), the FAC alleges that six Individual Plaintiffs—three located somewhere in the United States (states of residence not identified in the FAC) and three in various countries abroad (the United Kingdom, Canada and France)—"funded and pre-ordered" a Slidenjoy via Kickstarter during 2015. The receipts they received for the funds they transferred to Kickstarter indicated that delivery of their "reward" (Slidenjoy) would take place in or about December 2015. None of these six individuals has received a Slidenjoy to date; neither has any of them received a refund. FAC ¶¶ 37–42. What they have allegedly received from 120 Pixels and its employees is the runaround. *Id.* By the time they brought suit, in late 2022, delivery of their "reward" Slidenjoys was, by my estimate, almost seven years overdue.

The FAC does not plead any details about what crowdfunding is or how Kickstarter works. However, the complaint alleges that a contract was formed between Defendants and the Individual Plaintiffs who invested in the development of Slidenjoy. FAC ¶ 89. The terms of that contract are found in Kickstarter's mandatory "Terms of Service," which make it clear that an investment in a Kickstarter project creates a contract between the creator of a project (in this case, 120 Pixels) and a "backer" (a person who invests in the project through Kickstarter). Dkt No. 26, Ex. A § 4. Because the FAC pleads the existence of a contract, (FAC ¶ 89), the court may consider the terms of that contract—which are in any event publicly available on the internet.

Kickstarter is a website that allows people to invest in projects that need to be funded. As outlined in the Terms of Service, Section 4 (How Projects Work), when creators post a project on Kickstarter, they are "inviting other people to form a contract with them. Anyone who backs a

4

project is accepting the creator's offer, and forming a contract. Kickstarter is not a part of this contract." Dkt No. 26, Ex. A § 4.

The essence of the contract so formed is that the backer will provide funding for the project in anticipation of receiving a "reward" once the project has been successfully completed. That, of course, is exactly what the Backer Plaintiffs allege—that they invested in the project in anticipation of receiving a Slidenjoy once the device was developed. FAC ¶¶ 37–42. The FAC alleges that the Defendants offered a "product" (the Slidenjoy) via Kickstarter, raising some $10 million thereby. FAC ¶ 29.

The Kickstarter Terms of Service warn "backers" that they are "not ordering something that already exists," and explains that "there's a chance something could happen that prevents the creator from being able to finish the project as promised." They also warn that the target date for completion of the project and fulfillment of the reward might slip due to unforeseen circumstances. Dkt No. 26, Ex. A § 4.

But those same Terms of Service also warn creators that they have a contractual obligation to complete the project and fulfill the reward. By completing the project and fulfilling the reward, creators "satis[y] their obligation to their backers." *Id.* The Terms of Service lists a series of things that a creator who is unable to complete its project can do to try to remedy a situation in which it is unable to deliver a product (or deliver it in a timely manner), but warns that a creator who is "unable to satisfy the terms of this agreement, . . . may be subject to legal action by the backers." *Id.*

On behalf of the Purchaser Plaintiffs, the FAC alleges that Slidenjoys were offered for sale to the public through 120 Pixels' website, which was hosted on OVHcloud servers. FAC at ¶¶ 30–32. The FAC alleges that the Defendants have actively marketed the Product for seven years, but

5

that there has been no widespread manufacture or delivery of the same to the many individuals who ordered it through OVHcloud. *Id.* at ¶ 1, 30–33.

The FAC alleges that eight individuals in the United States (again, states not identified) and five located abroad (the Netherlands, France, Spain, India, and the United Kingdom) ordered Slidenjoys directly from 120 Pixels over its OVHcloud website. These orders were placed as far back as 2016 and as recently as 2022.[4] These individuals allege, in evidentiary affidavits attached to the FAC, that they were told either that the Product was ready to ship at the time of purchase or that it would be ready to ship within a few weeks of purchase. None of these thirteen Purchaser Plaintiffs has ever received either a Slidenjoy or a refund. FAC ¶¶ 43–50, 52–56.

The FAC alleges that the Slidenjoy Product was never successfully developed. Defendants assert[5] that they updated Kickstarter project backers over eighty times about the various setbacks they encountered on their Kickstarter project page, https://www.kickstarter.com/projects/slidenjoy/slidenjoy-double-or-triple-your-screens/posts. Chief among those setbacks—again, per Defendants (and so not presumed true)—was a patent infringement suit filed before my colleague,

---

[4]  The names of these 13 plaintiffs, their locations, and their dates of purchase—all information taken from the FAC and the attached affidavits that are supposedly incorporated therein—are as follows:

|    | Name | Location | Date of Purchase |
|----|------|----------|------------------|
| 1  | Matthew P. Demaree | United States | 04/05/2019; 11/25/2019 |
| 2  | Marlon Doyle | United States | 02/03/2020 |
| 3  | Daniel MacDonald | United States | 03/24/2016 |
| 4  | Matthew Mickle | United States | 08/22/2018; 12/2018 |
| 5  | George Taylor | United States | 04/06/2017 |
| 6  | Scott W. Williams III | United States | 04/30/2022 |
| 7  | Denise Yelvington | United States | 03/03/2017; 10/03/2019 |
| 8  | Alex Yohn | United States | 11/13/2019 |
| 9  | Danny Adamse | Netherlands | 05/17/2016 |
| 10 | Jolan Reynaud | France | 09/26/2016 |
| 11 | Bernat Roig Marin | Spain | 04/03/2018 |
| 12 | Puneet Sabharwal | India | 11/13/2019 |
| 13 | Diego Schouten | United Kingdom | 06/09/2022 |

[5]  This information does not appear in the FAC, and so is not relevant on a motion to dismiss; I simply include it as pertinent background.

Judge Gardephe, in 2019. *Jordan v. Slidenjoy et al.*, 19 Civ. 11868 (PGG).[6] The docket sheet in the patent suit—aside from documenting the numerous procedural and filing errors made by Plaintiffs' counsel (who is also Plaintiffs' counsel in this case)—reveals that Judge Gardephe denied Plaintiffs' motion for a preliminary injunction, after which the case was dismissed with prejudice.

The FAC contains no specific allegations with respect to the vast majority of the named Plaintiffs. Attached to the text of the FAC are extensive exhibits that purport to be incorporated by reference into the pleading.[7] These include affidavits from nineteen of the more than one hundred individual plaintiffs, together with a variety of evidence, including emails exchanged between various Plaintiffs and OVHcloud, emails and messages between certain Plaintiffs and 120 Pixels through various websites and social media sites, examples of Slidenjoy marketing and posts on Instagram, LinkedIn, Kickstarter, and Portabl's website, LinkedIn pages of Defendants, Defendants' registration documents and trademark applications, and Plaintiffs' email confirmations, receipts, and bank statements.

All Defendants, whether served or not, have moved to dismiss the FAC.

---

[6]   By which point delivery of the Product, at least to the Kickstarter backers, was already four years overdue.

[7]   This is a wholly improper pleading technique. A complaint is supposed to be a single document containing a "short, plain statement" of the claims being asserted against the defendants. The FAC contains a short, plain statement of nothing. Affidavits are evidence, not a pleading; any information in the affidavits that is relevant to the "short plain statement" of a claim should appear in the body of the complaint itself. The rest of the attachments are also simply items of evidence, not aspects of any short, plain statement of claims.

## DISCUSSION

### I.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *Iqbal*, 566 U.S. at 680. The Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

The FAC is defective in many ways. However, the easiest defect with which to deal is the RICO claim—which is the sole basis for Plaintiffs' assertion of federal question jurisdiction.

### II.    The RICO Claims Are Dismissed With Prejudice and Without Leave to Replead

The only federal claims alleged in the FAC arise under the Racketeering and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961–68. Plaintiffs plead a substantive RICO violation

8

pursuant to Section 1962(c), as well as conspiracy to violate RICO's substantive prohibitions pursuant to Section 1962(d).

To plead a substantive RICO claim, a plaintiff must allege facts tending to show that the defendant has violated the RICO statute in "(1) that the defendant[s] (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise,' (7) the activities of which affects interstate or foreign commerce." *Moss v. Morgan Stanley*, 719 F.2d 5, 17 (2d Cir. 1983), *cert. denied*, 465 U.S. 1025 (1984).

Courts generally approach RICO claims with caution and an understanding of Congress's goal in enacting the RICO statute: to prevent legitimate businesses from becoming infiltrated by organized crime—though the statute's reach is not limited to mobsters. *See United States v. Porcelli*, 865 F.2d 1352, 1362 (2d Cir. 1989). "Because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998). Although plaintiffs often zealously pursue RICO claims, particularly in cases involving fraud, plaintiffs asserting RICO frequently miss the mark and have their cases dismissed at the outset. *See Gross v. Waywell*, 628 F. Supp. 2d 475, 479–80 (S.D.N.Y. 2009) (conducting a survey of 145 civil RICO cases filed in the Southern District of New York from 2004 through 2007, and finding that all 36 cases that were resolved on the merits resulted in judgments against the plaintiffs, including 30 at the motion to dismiss stage).

The FAC identifies the Enterprise engaging in RICO activity as an association-in-fact consisting of the named Defendants plus non-defendant parties Kickstarter and OVHcloud. The alleged RICO acts consist of fourteen alleged acts of wire fraud in violation of 18 U.S.C. § 1343.

Wire fraud qualifies as a predicate act under Section 1961(1) of RICO—though one of which courts are particularly suspicious in civil RICO cases like this one. Indeed, RICO claims premised on allegations of mail or wire fraud warrant particular scrutiny, "because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Id.* at 493 (citing *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)).

The alleged object of the RICO enterprise was to obtain money by promising to deliver Slidenjoys but never doing so.

The RICO allegations in the FAC are deficient on a number of grounds, only some of which need be discussed here.

## A. 120 Pixels and the Individual Defendants Are Not "Distinct" RICO Persons and So Cannot Form an Enterprise

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Ulit4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 (2d Cir. 2017) (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001)). "The existence of an 'enterprise'—one existing 'separate and apart from the pattern of activity in which it engages'—is a necessary element of a section 1962(c) violation." *D'Addario v. D'Addario*, 901 F.3d 80, 99 (2d Cir. 2018) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Section 1961(4) defines "enterprise" as "an individual, partnership, corporation, association, or other legal entity, and any . . . group of individuals associated in fact." 18 U.S.C. § 1961(4). "For an association of individuals to constitute an enterprise . . . the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Cap. Asset Mgmt. Inc. v. Satinwood, Inc.*, 385 F. 3d

10

159, 173 (2d Cir. 2004) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993), *aff'd,* 27 F.3d 763 (2d Cir. 1993)).

The enterprise alleged in the FAC consists principally of 120 Pixels and its founders/officers/employees. But as a matter of law, a RICO enterprise cannot "consist[] merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F. 3d 339, 344 (2d Cir. 1994). That is because there is no "distinctness" between a corporation and its employees in carrying out the work of the corporation: "[T]he plain language and purpose of the statute contemplate that a person violates the statute by conducting an enterprise through a pattern of criminality. It thus follows that a corporate person cannot violate the statute by corrupting itself. " *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013).

There is one exception to the rule of *Riverwoods*: "when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority." *Cedric Kushner Promotions, Ltd. V. King*, 533 U.S. 158, 166 (2001). In such circumstances, the sole corporate owner and the corporation may satisfy the distinctness requirement of both "person" and the "enterprise" under 18 U.S.C. § 1962(c). *Id.* at 161.

However, the FAC does not allege that 120 Pixels is any individual's wholly-owned corporation, so this exception does not apply. As recently as 2017, the Second Circuit explicitly limited the holding in *Cedric Kushner* to its facts (that is, to a situation in which the employee is the sole owner of the corporation alleged to be a RICO person). *See U1it4less, Inc.*, 871 F.3d at 207–08. In so doing, it was following *Cedric Kushner* itself, where the Supreme Court quite

11

specifically held that *Riverwoods Chappaqua* was still good law except in the unusual factual situation therein pleaded. *Cedric Kushner Promotions, Ltd.*, 533 U.S. at164.

"Accordingly, a plaintiff may not circumvent the distinctness requirement 'by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant . . . ." *U1it4less, Inc.*, 871 F.3d at 206 (quoting *Riverwoods Chappaqua Corp.*, 3 F.3d at 344). "A corporate entity can be sued as a RICO 'person' or named as a RICO 'enterprise,' but the same entity cannot be both the RICO person and the enterprise." *Id.* at 205 (citations omitted).

In the FAC, the principal parties alleged to makeup the enterprise are 120 Pixels and the Individual Defendants. FAC ¶ 35, 59, 60. But the individual Defendants are all employees or agents of 120 Pixels. In fact, the FAC specifically alleges that the individual defendants are "associated in fact through employment" by 120 Pixels, which in turn is alleged to exist to "market[], promot[e], sell[], and [manufacture] the Product." FAC ¶ 61. Specifically, Wery is alleged to be the CEO of 120 Pixels and cofounder of SNJ S.A.; Jeunehomme and Castro are alleged to be "directors/officers" of SNJ S.A., and "founder[s] and marketer[s]" [i.e., agents] of 120 Pixels. Detraux and Joué are alleged to be customer service agents; Virtudazo is a "customer service support manager;" Rodrigues is a "community manager" who posted to the company's website; and Polizzi is a "marketing supervisor" who allegedly created video presentations and image stills of the Slidenjoy. FAC ¶¶ 8.2–16. In short, each of the individual defendants is alleged to be performing some task(s) that carry on the regular affairs of 120 Pixels as employees. The FAC contains numerous allegations that this is precisely what the individual defendants were engaged in doing. FAC ¶¶ 8.2–16, 60–62.

12

"The requirement of distinctness cannot be evaded by alleging that a corporation has violated the statute by conducting an enterprise that consists of itself plus all or some of its officers or employees." *Cruz*, 720 F.3d at 121. Therefore, because an enterprise cannot be comprised solely of a corporation and its employees, the Individual Defendants and the corporation cannot form a RICO enterprise.

## B. **SNJ Is Also Not a Distinct RICO Person From 120 Pixels and the Individual Defendants, and No Facts Are Pleaded Tending to Show that SNJ Was a Member of The Alleged Enterprise**

Plaintiffs next allege that the remaining named defendant—the Luxembourg corporation SNJ S.A., which was allegedly founded by the same three individuals who are behind 120 Pixels (Wery, Castro, and Jeunehomme) (FAC ¶ 60)—is a member of the enterprise. However, on the facts alleged, SNJ cannot be a member of an enterprise with 120 Pixels and the founders because it is not a distinct person from them.

When two separate corporations and the natural persons who control them both are alleged to constitute an enterprise, as is pleaded in the FAC, the corporations will not be deemed to meet the standard for RICO distinctness unless the two corporations are "active corporations that operate independently in different lines of business, receive independent benefits from the illegal acts of the enterprise, and affirmatively use their separate corporate status to further the illegal goals of the enterprise." *U1it4less, Inc.*, 871 F.3d at 206. If the facts pleaded reveal nothing except that the two corporations "operate within a unified corporate structure" and as a "single corporate consciousness," *id.* at 209, they will not be considered to be distinct RICO persons.

On the facts pleaded in the FAC, SNJ is not distinct from 120 Pixels and its employees. The pleading does not allege that SNJ is an "active corporation;" indeed, the FAC specifically alleges that SNJ conducts "no significant business" whatsoever. FAC ¶ 60. The FAC alleges (on

information and belief) that that SNJ is "an offshore entity utilized by the Enterprise to possess the assets garnered from the enterprise's fraudulent efforts" (FAC ¶ 8.2), and that it exists solely to "possess the assets garnered from the enterprise's fraudulent efforts, . . . including monetary assets and trademark rights . . . ." *Id.* at ¶ 8.2. More specifically, the FAC alleges that the other Defendants used SNJ as a repository for their ill-gotten gains from the sale of Slidenjoys—a fact pleaded entirely on information and belief, and apparently predicated on the alleged fact that Luxembourg is a haven for money laundering. FAC ¶¶ 8.2, 30.[8]

These pleaded facts do not suggest that SNJ is sufficiently "distinct" from 120 Pixels and its employees to qualify as a separate member of the alleged enterprise. They do not suggest that SNJ operates independently and is in a different line of business from 120 Pixels; rather, they suggest that SNJ is merely an arm of 120 Pixels' operations. In that, the pleading is similar to the complaint in *Fossil Grp., Inc. v. Angel Seller LLC*, 627 F. Supp. 3d 180 (E.D.N.Y. 2022). In that case, the court rejected an argument that a company authorizing the use of registrations and trademarks to the other alleged corporate member of the enterprise could qualify as distinct business activity, stating that the "factual claims allege [a] close business relationship between a licensor and licensee . . . [they] do not establish . . . the existence of distinct RICO persons who associated 'with others to form an enterprise that is sufficiently distinct from itself." *Id.* at 201 (quoting *Riverwoods*, 30 F.3d at 344).

The facts pleaded are also difficult to distinguish from *U1it4less*—a case in which the plaintiff tried to plead the existence of an enterprise by asserting that various separate corporations under common ownership and control (FedEx and various subsidiaries) constituted an enterprise.

---

[8] *Ipse dixit* statements like these that are pleaded on information and belief, with no facts alleged about the basis for that information and belief, are not "well pleaded" factual allegations that must be presumed true on a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That too supports dismissal of the RICO claim against SNJ.

On the RICO claims, the main issue was whether "the mere fact of separate legal incorporation satisfied the distinctness requirement under Section 1962(c)." *Ulit4less, Inc.*, 871 F.3d at 205. The district court held that it did not, and the Second Circuit affirmed. Citing the settled rule that "a RICO enterprise [cannot] consist[] merely of a corporate defendant associated with its own employees or agents . . . .," *id.* at 206 (citing *Riverwoods*, 30 F.3d at 344), the court held that "no reasonable juror could consider FedEx Corp.'s and FedEx Service's participation in FedEx Ground's affairs as anything other than participation in FedEx Corp.'s own ground shipping business." *Id.* So here, if (as is pleaded) SNJ is commonly owned, and controlled, and SNJ holds the assets that 120 Pixels uses in its business (money, trademarks), then a trier of fact could only infer that SNJ is participating in the business of 120 Pixels.[9]

Additionally, the FAC does not allege facts explaining how SNJ's holding of 120 Pixels' assets and trademarks is in "any way related to (let alone used to further) the racketeering activity alleged in the complaint." *Ulit4less, Inc.*, 871 F.3d at 207. Neither does the FAC plead any fact tending to show that SNJ independently benefits from holding 120 Pixels' assets. *Id.* at 207. In *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 263 (2d Cir. 1995), the Second Circuit held that two individual corporations and their owner could be both the "persons" and "enterprise" but only because "each was an independent entity that could benefit from [the owner's] nefarious activities." Here, in contrast, no facts are pleaded tending to show that SNJ did, or could, derive any independent benefit from the "nefarious activities" of its owners. *Id.* The instant case can further be distinguished from *Securitron* because in that case, "[t]he corporations [were] in distinct lines of business," and "were active, operating businesses . . . ." *Id.* But here Plaintiffs specifically

---

[9] The Second Circuit in *Ulit4less* distinguished *Cedric Kushner* on the ground that *Cedric Kushner* "was not addressing cases in which, as here, a corporate person conducts the affairs of an enterprise consisting only of corporate members of its wholly-owned corporate family." *Ulit4less, Inc.*, 871 F.3d at 208.

15

allege that SNJ conducts "no significant business." FAC ¶ 60. As a result, it cannot be said that SNJ operates as an independent corporate entity with an independent corporate consciousness.

In short, as pleaded in the FAC, SNJ and 120 Pixels "'operate within a unified corporate structure' and are 'guided by a single corporate consciousness'. . . ." *U1it4less, Inc.*, 871 F.3d at 209. "[T]here are no allegations that [SNJ] acted in any role independent either from the alleged . . . Enterprise or [120 Pixels], and essentially no allegations indicating [SNJ's] role in the scheme at all." *Weir v. Cenlar FSB*, 16-CV-8650, 2018 WL 3443173, at *8 n.7 (S.D.N.Y. July 17, 2018). Therefore, SNJ and 120 Pixels are not sufficiently distinct to be independent members of an association-in-fact enterprise.

Finally, the allegation that SNJ served as a repository for 120 Pixels' assets does not support any inference that SNJ "participat[ed] in the operation or management of the enterprise itself," as required of the members of an association-in-fact enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). On the contrary, the only logical inference is that 120 Pixels operates and manages SNJ—an inference entirely consistent with the lack of any corporate distinctness. And to the extent that Plaintiffs are essentially alleging that SNJ acted as 120 Pixels' "piggy bank," it is well settled that "providing banking services . . . is not enough to state a claim under § 1962(c)." *Indus. Bank of Latvia v. Baltic Fin. Corp.*, No. 93 Civ. 9032, 1994 WL 286162, at *3 (S.D.N.Y. June 27, 1994); *see also Moss*, 258 F. Supp. 3d at 307–08.

Therefore, adding SNJ to the other named Defendants does not get Plaintiffs over the distinctness hump or create an association-in-fact enterprise.

## C. **The FAC Fails to Allege that Kickstarter and OVH Are Part of the Alleged Enterprise**

To overcome the fact that the named defendants are not sufficiently distinct, the FAC alleges that two other entities are ostensible members of the purported enterprise: Kickstarter and

16

OVHcloud. But the FAC alleges not a single fact tending to show that either of these entities was anything other than an independent actor with which 120 Pixels had regular business dealings. Therefore, the allegations of the FAC fail to give rise to a plausible inference that either company is a member of any alleged enterprise.

"RICO associations-in-fact need exhibit only three structural features: (1) a shared purpose; (2) relationships among the associates; and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *D'Addario v. D'Addario*, 901 F.3d 80, 100 (2d Cir. 2018) (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)).

As noted, the alleged purpose of the scheme undertaken by the alleged RICO enterprise was to obtain money by promising to deliver Slidenjoys to Kickstarter investors or internet consumers but failing to make good on that promise. Not a single fact is alleged tending to show that either Kickstarter or OVH shared that common purpose with 120 Pixels and its employees.

We begin with Kickstarter. The Kickstarter Terms of Service (the contract pleaded in the complaint between 120 Pixels and at least 16 or 17 of the Plaintiffs, the terms of which are properly considered on a motion to dismiss) make it perfectly clear that Kickstarter was not "work[ing] together" with 120 Pixels and its employees in pursuit of a "common fraudulent purpose" to get money for some enterprise by promising but failing to deliver Slidenjoys. Rather, Kickstarter specifically disclaimed that it had anything to do with 120 Pixels' project, its success or failure. It simply offered a platform on which people intrigued by the company's plan to market the Slidenjoy could connect with 120 Pixels and "invest" in exchange for a computer screen extender. No facts are alleged in the FAC tending to demonstrate that Kickstarter shared the nefarious purpose of obtaining money from the Backer Plaintiffs under false pretenses that the pleading assigns to 120 Pixels and its employees. Nor is any fact alleged tending to show that Kickstarter was involved in

either the development or marketing of the Slidenjoy. There are only conclusory allegations that Kickstarter share with the Defendants the "common purpose" of "marketing and selling the [Slidenjoy] Products," backed by no facts whatever. FAC ¶ 59.

The facts pleaded admit only of the conclusion that Kickstarter provided a service to 120 Pixels—that service being the opportunity to make its development of the Slidenjoy known to potential investors over a crowdfunding platform. That makes Kickstarter nothing more than an outside service provider to 120 Pixels. And outside service providers do not become members of a RICO enterprise simply by providing services that may be of benefit to an enterprise.

While "'outsiders' may be liable under § 1962(c) if they are 'associated with' an enterprise and participate in the conduct of its affairs—that is, participate in the operation or management of the enterprise itself . . . ," *Reves*, 507 U.S. at 179, an outsider "may not be held liable merely . . . for providing 'goods and services that ultimately benefit the enterprise.'" *Yien-Koo King v. Wang*, 14-cv-7694, 2020 WL 6875403, at *19 (S.D.N.Y. Nov. 23, 2020) (quoting *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 451–52 (S.D.N.Y. 2004)). "Indeed, it is well established that the provision of professional services by outsiders . . . to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself." *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248, 254 (S.D.N.Y. 1997). "Simply put, 'one is liable under RICO only if he 'participated in the operation or management of the enterprise itself.' " *First Cap. Asset Mgmt.*, 385 F.3d at 176 (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994).

No facts are alleged tending to show that Kickstarter had any involvement whatsoever in the "operation or management" or in directing the affairs of the alleged enterprise. The only facts alleged relate to Kickstarter's provision of services to 120 Pixels. Courts routinely hold that

18

providing outside services "does not qualify as 'conducting or participating' in the affairs of a RICO enterprise, even when the defendant is aware of the enterprise's unlawful activity." *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 307 (E.D.N.Y. 2017).

Plaintiffs assert that Kickstarter had knowledge of Pixel 120s' allegedly fraudulent inducement of consumers as a result of consumer complaints, and "failed to act" on that information. FAC ¶ 36. But no facts are alleged tending to show that Kickstarter knew anything about the business dealings of 120 Pixels until "about a year" before the filing of the original complaint in this action, which occurred on October 14, 2022. FAC, Ex. M. This means that Kickstarter is not alleged to have known anything about the alleged enterprise's illicit dealings until almost six years after the crowdfunding period hosted on its site closed in December 2015. The only thing Kickstarter is alleged to have done is host the crowdfunding site, so nothing is pleaded to suggest that there was anything Kickstarter could have "done" when, years after its services were used, it belatedly learned about 120 Pixels' failure to fulfill rewards.

Therefore, nothing in the FAC even remotely suggests that Kickstarter could possibly be a member of the alleged enterprise.

The same is true of OVHcloud, as to which even fewer facts are alleged in the FAC. OVH is simply an internet service provider on which 120 Pixels elected to post its website. The dealings between 120 Pixels and the consumers who purchased Slidenjoys on that website were between 120 Pixels and the consumers, there is no allegation that they involved OVHcloud. As was the case with Kickstarter, the FAC alleges no facts tending to show that OVH shared with 120 Pixels and its principals a common purpose to defraud consumers by collecting money from them but not delivering a Slidenjoy, or that OVHcloud took any affirmative steps to further this purpose, or that OVH profited in any manner from the commercial activity conducted over its platform.

19

As was the case with Kickstarter, Plaintiffs allege that OVHcloud "failed to act" in some unspecified way when it was told that 120 Pixels were engaged in fraud. FAC ¶ 36. But such an allegation does not give rise to any inference that OVHcloud played any role in participating in the "operation or management" of the enterprise's affairs, or that it played any "part in directing the enterprise's affairs . . . ." *Reves*, 507 U.S. at 179. Failing to act does not clear the "relatively low hurdle" of satisfying the "operation or management" test. *First Cap. Asset Mgmt.*, 385 F.3d at 176.

Moreover, the allegation of failing to "act" (presumably, by taking down the company's webpage) after being advised of 120 Pixels' misconduct does not plausibly suggest that OVHcloud had any "common purpose" with the company's failure to deliver the Slidenjoys after taking money for them. Indeed, per the FAC, OVHcloud was not informed of 120 Pixels' failure to deliver product until September 25, 2022—well after all but one of the Purchasing Plaintiffs had allegedly ordered their Slidenjoys. FAC, Ex. N2. And in any event, 47 U.S.C. § 230 insulates OVHcloud from liability for failing to take down 120 Pixels' web pages or sites, even if it was advised of some irregularity. *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 174 (2d Cir. 2016).

On the facts pleaded, the only thing Kickstarter and OVH did with respect to the other members of the enterprise was enter into service contracts with 120 Pixels. "But contracts alone cannot give rise to a RICO enterprise; if they could, all types of 'loose connection[s]' among corporate entities could carry a risk of RICO liability." *Alix v. McKinsey & Co.*, No. 18-CV-4141, 2023 WL 5344892, at *9 (S.D.N.Y. Aug. 18, 2023) (quoting *Manhattan Telecomms. Corp. v. DialAmerica Mktg., Inc.*, 156 F. Supp. 2d 376, 383 (S.D.N.Y. 2001)). "Notably absent from the complaints' narrative are any allegations that [the non-parties] benefited in any way from the alleged enterprise. Similarly, the complaints lack any 'specific factual allegation[s] about the

20

intent' of [the non-party service providers] . . . . Plaintiffs' failure to allege a plausible common purpose among the RICO defendants is fatal to their assertion that these defendants formed an association-in-fact RICO enterprise." *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (quoting *Cruz*, 720 F.3d at 121).

In sum, the FAC does not plead sufficient facts—or any facts—tending to show that non-parties Kickstarter and OVHcloud were involved in the management of the alleged enterprise or shared a common purpose with 120 Pixels and its employees. Nor can this failure be remedied by granting leave to replead.

Therefore, Count 1 of the FAC, alleging a violation of 18 U.S.C. § 1962(c), is dismissed with prejudice.

## D. **Failure to Plead RICO Conspiracy**

Plaintiffs' other federal cause of action (Count 2)—the claim for RICO conspiracy in violation of 18 U.S.C. § 1962(d)—fails because Plaintiffs have failed to state a claim for the underlying substantive RICO violation. *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 221 (S.D.N.Y. 2002) (citing *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062–63 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998)).

18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate" § 1962(c). 18 U.S.C. § 1962(d). "Plaintiffs' RICO conspiracy claims are entirely dependent on their substantive RICO claims . . . .," *First Cap. Asset Mgmt.*, 385 F.3d at 164, therefore, "failure to state a claim for a substantive RICO violation . . . is fatal to [a] RICO conspiracy claim under § 1962(d)." *D. Penguin Bros. Ltd.*, 587 Fed. Appx. at 669 (citing *First Cap. Asset Mgmt*, 385 F.3d at 182). Because Plaintiffs have failed to state a claim for the underlying substantive RICO violation, Plaintiffs' claim for RICO conspiracy, in violation of 18 U.S.C. § 1962(d), necessarily

21

fails. *One World, LLC v. Onoufriadis*, No. 20 CIV. 5802 (CM), 2021 WL 184400, at \*11 (S.D.N.Y. Jan. 19, 2021), *aff'd,* No. 21-374-CV, 2021 WL 4452070 (2d Cir. Sept. 29, 2021). It, too, is dismissed with prejudice.

## III.     The Pendent State Law Claims Are Dismissed

Having dismissed the RICO claim, it is clear that this case cannot proceed in the federal court.

The remainder of the claims asserted arise under state law: common law fraud, unjust Enrichment, Breach of Contract, Breach of Implied Duty of Good Faith and Fair Dealing, and violation of New York's General Business Law § 349.

The Court could take cognizance of these claims under its supplemental jurisdiction, 28 U.S.C. § 1367(a), which provides that a district court that has original jurisdiction over civil claims "shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III of the United States Constitution." *F5 Capital v. Pappas*, 856 F.3d 61, 77 (2d Cir. 2017) (quoting 28 U.S.C.A. § 1367(a)). But as the only federal claims have been dismissed at the outset of the case, there is no requirement that any state law claims be adjudicated here, and I decline to do so. 28 U.S.C. §1367(c)(3); *United Mine Workers of American v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004).

Of course, the Court would be required to retain jurisdiction over the state law claims if the parties met the requirements for diversity jurisdiction. They do not.

First and foremost, extrapolating from the allegations of the complaint, it appears from the pleading that each of the 118 or so individual plaintiffs paid between $300-$600 for a product that

22

Case 1:22-cv-08772-CM Document 76 Filed 10/04/23 Page 23 of 31

was ordered but never delivered. Each of these plaintiffs has his or her own individual claim for breach of contract, and for any other common law or consumer fraud claim that might be associated therewith.[10] The minimum amount in controversy for invocation of diversity jurisdiction is $75,000. None of the Individual Plaintiffs' claims comes anywhere close to that amount.

It may be that plaintiffs' counsel thought he could aggregate the small claims of numerous individuals to reach the minimum amount in controversy. But that it not the case. Unless individuals share a "common interest," different plaintiffs may not aggregate their individual claims in order to reach the jurisdictional minimum. *Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291, 296 (2d Cir. 2000); *Gilman v. BHC Sec., Inc.*, 104 F.3d 1418, 1424 (2d Cir. 1997). Rather, every individual plaintiff must have suffered $75,000 in damages in order to sue in diversity. 28 U.S.C. § 1332(a); *Snyder v. Harris*, 394 U.S. 332, 338 (1969); *see also Mehlenbacher*, 216 F.3d at 296–97.

Merely having identical claims against the same parties is not enough to give the plaintiffs a "common interest." Plaintiffs share a common interest only when they "possess joint ownership of, or an undivided interest in, a common res . . . ." *Gilman*, 104 F.3d at 1424. "Plaintiffs in paradigm 'common fund' cases assert claims to a piece of land, a trust fund, an estate, an insurance policy, a lien, or an item of collateral, which they claim as common owners or in which they share a common interest arising under a single title or right." *Id.*

In the instant case, Plaintiffs have no "joint or common interest or title." *Snyder*, 394 U.S. at 337. "The claims raised by the plaintiffs here are separate and distinct from one another, as they seek recovery for their losses as individuals only, and not collectively. . . . Accordingly, plaintiffs'

---

[10] The only consumer fraud statute cited is New York's General Business Law, but that section applies by its terms only to transactions involving New York consumers in New York. N.Y. Gen. Bus. Law § 349(a), (h). Very few of the Plaintiffs identified in the FAC or any of its attachments are New Yorkers or can claim to have made the transactions at issue in New York.

23

claims may not be aggregated to obtain the necessary jurisdictional amount." *Mehlenbacher*, 216 F.3d at 296–97.[11]

Second, it is not apparent from the complaint that there is complete diversity between the Plaintiffs and the Defendants. Indeed, after parsing the prolix exhibits attached to the FAC, it is apparent that there is not.

Diversity jurisdiction extends to suits between "citizens of a State" and "citizens or subjects of a foreign State." 28 U.S.C. § 1332(a)(2). The Defendants in this case are all citizens of foreign States (Belgium and Luxembourg), but not every plaintiff is a "citizen of a State." Many of the Plaintiffs are themselves foreign nationals. Foreign nationals are not "citizens of States" (which is to say, of one of the fifty states that make up the United States of America); they are citizens of foreign States. Diversity jurisdiction does not extend to suits among citizens of foreign States and citizens of foreign States. *See Hodgson v. Bowerbank*, 9 U.S. 303, 304 (1809); *Tagger v. Strauss Group Ltd.*, 951 F.3d 124, 126 (2d Cir. 2020); *Steiner v. Atochem, S.A.*, 70 Fed. Appx. 599, 600 (2d Cir. 2003). Therefore, there is not complete diversity of citizenship between the 118 Plaintiffs and the Defendants.

There is no need to consider whether a New York would have *in personam* jurisdiction over any of the foreign defendants in what are essentially 118 (or so) individual breach of contract claims. The remaining claims in suit are dismissed without prejudice. Plaintiffs are remitted to the pursuit of individual remedies in their home fora—wherever those fora may be—and subject to

---

[11] Moreover, assuming 120 plaintiffs (which is more or less the number currently in the case) and $500 per Slidenjoy (a generous amount, as some plaintiffs specifically allege that they paid far less), were aggregation permissible (and it is not) plaintiffs still do not meet the $75,000 minimum threshold for diversity jurisdiction under this action as pled. And since Plaintiffs explicitly plead that this is not a class action, there is no need to analyze whether jurisdiction might attach pursuant to the Class Actions Fairness Act, 28 U.S.C. §§ 1711–15.

24

whatever defenses (including for at least some, perhaps many, of these plaintiffs, the statute of limitations) may be raised against them.

## IV.    Defendants' Motion for Sanctions is Granted in Part and Denied in Part.

Defendants move for imposition of sanctions pursuant to Fed. R. Civ. P. Rule 11 against Plaintiff's counsel, Robert M. DeWitty, of DeWitty and Associates, Chtd., and Plaintiffs Scott W. Williams III and Matthew Philip Demaree on the grounds that Plaintiffs' First Amended Complaint lacked an evidentiary basis and was not warranted under existing law.

Because Plaintiffs' counsel brought frivolous claims that could not have been thought to be objectively reasonable under existing law, the motion is GRANTED in part. Because Plaintiffs Williams and Demaree were entitled to rely on the advice of counsel, the motion as to Plaintiffs is DENIED.

### A.  Legal Standard for Rule 11

Rule 11(b) of the Federal Rules of Civil Procedure sets forth the mechanism for imposing sanctions, providing in relevant part that:

> By presenting to the court a pleading, written motion, or other paper . . . an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed R. Civ. P. 11(b)

"Rule 11 sanctions are a coercive mechanism, available to trial court judges, to enforce ethical standards upon attorneys appearing before them, while being careful not to rein in zealous advocacy." *Pannonia Farms, Inc., v. USA Cable*, 426 F.3d 650, 652 (2d Cir. 2005). And while the imposition of sanctions is within the province of the district court, "any such decision [should be] made with restraint and discretion." *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999).

The decision of whether to award sanctions under Rule 11 rests firmly within the discretion of the trial court. *Amorosa v. Ernst & Young LLP*, 2010 WL 245553, at \*3 (S.D.N.Y. Jan. 20, 2010) (citing *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004)).

The implementation of Rule 11 requires a careful balancing of two interests of the court: reprimanding egregious behavior and avoiding restraint of creative legal arguing. However, that required balance does not undermine Rule 11's imposition on counsel of the "affirmative duty to conduct a reasonable inquiry into the facts and the law before filing, and that the applicable standard is one of reasonableness under the circumstances." *Bus. Guides, Inc. v. Chromatic Comm'ns Enters., Inc.*, 498 U.S. 533, 551 (1991). In the Second Circuit, "[a]n argument constitutes a frivolous legal position for the purposes of Rule 11 sanctions if, under the objective standard of reasonableness, it is clear . . . that there is no chance of success and no reasonable argument to extend, modify, or reverse the law as it stands." *Morley v. Ciba–Geigy Corp.*, 66 F.3d 21, 25 (2d. Cir. 1995) (quoting *Caisse Nationale de Credit Agricole–CNCA v. Valcorp, Inc.*, 28 F.3d 259, 264 (2d. Cir. 1994)). "Accordingly, courts in the Second Circuit have found sanctions appropriate in cases where a plaintiff files a claim that is clearly deficient and where he advances no plausible

26

argument in favor of validity." *de la Fuente v. DCI Telecommunications, Inc.*, 259 F.Supp.2d 250, 262 (S.D.N.Y. 2003).

"Rule 11's deterrence value is particularly important in the RICO context, as commencement of a civil RICO action has 'an almost inevitable stigmatizing effect' on those named defendants. Accordingly, Courts in this Circuit have on numerous occasions imposed Rule 11 sanctions based upon the filing of a frivolous RICO action. *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 660 (S.D.N.Y. 1996), *aff'd,* 113 F. 3d 1229 (2d Cir. 1997).

### B. Rule 11's Safe Harbor Requirements

Before imposing sanctions, the Court must be satisfied that the requirements of Rule 11 were strictly followed. Rule 11's safe harbor provision provides:

> A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.

Fed R. Civ. P. 11(c)(2).

The safe harbor provision was added to Rule 11 "with the intention of affording a party a "'safe harbor'" against motions under Rule 11 whereby that party would 'not be subject to sanctions . . . unless, after receiving the motion, it refuse[d] to withdraw that position or to acknowledge candidly that it d[id] not . . . have evidence to support a specified allegation.'" *Safe-Strap Co v. Koala Corp.*, 270 F. Supp. 2d 407, 413 (S.D.N.Y. 2003) (citing Fed. R. Civ. P. 11 Advisory Committee's Notes (1993 Amendments)). It requires a party who believes his opponent has filed a paper without having a good faith basis for doing so to serve the non-moving party with a "motion" at least 21 days before actually filing the motion in court. Fed. R. Civ. P. 11(c). The purpose of serving the motion in advance is to give the non-moving party time to

27

withdraw the offending pleading. The requirement is absolute; a court may not grant a motion for sanctions if the moving party fails to serve the "motion" at least 21 days before filing it with the court. Moreover, "[a]n informal warning . . . letter without service of a separate Rule 11 motion is not sufficient to trigger the 21-day safe harbor period." *Star Mark Mgmt., Inc. v. Koon Chun Hing Key Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012).

A notice of a motion for sanctions must explain "(1) the source of authority for the sanctions being considered; and (2) the specific conduct or omission for which the sanctions are being considered . . . ." *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012) (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999). "[O]nly conduct explicitly referred to in the instrument providing notice is sanctionable." *Id.*

There is no dispute that Plaintiffs' counsel was served with Rule 11 safe harbor notice. Plaintiff's counsel agrees that he and the two individual Plaintiffs were served with the notice of motion on or about January 23, 2023, (Dkt. No. 60, at 5); Defendants assert that Plaintiffs were served on January 24, 2023, by U.S. mail. Defendants assert, and Plaintiffs do not dispute, that attached to the notice of motion was a cover letter (which has not been provided to the Court), a notice to preserve evidence (ditto), a legal memorandum that is "largely identical" to the Memorandum in Support of the Motion for Sanctions ultimately filed with the Court, and a copy of the exhibits, excluding Jeunehomme's Declaration. Dkt. 57, at 5. The Motion for Sanctions was ultimately filed with the Court on February 20, 2023, which is more than 21 days from either stated date of service.

I conclude that the requirements of Rule 11 were met. Plaintiffs' counsel admits that he received safe harbor notice and had at least 21 days to consider the allegations, but chose not to amend or withdraw the FAC.

## C. Plaintiffs' RICO Claims Are Frivolous and Cannot Satisfy the Objective Reasonableness Standard

Defendants seek sanctions against Plaintiffs' counsel on the grounds that the FAC is frivolous.

Under the "objectively reasonable" standard, no competent attorney could have formed a reasonable belief that the RICO claims (asserted in the FAC) were well grounded in fact and warranted by existing law. The Court thus agrees that Rule 11 sanctions should be awarded against Plaintiffs' counsel, Robert M. DeWitty, for filing that claim. *Sorenson v. Wolfson*, 638 F. App'x 33, 35 (2d Cir. 2017) (quoting *Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002)). Counsel tried to aggregate 118 individuals with 118 different claims arising under the laws of various states and countries and federalize them under the umbrella of a civil RICO claim; that easily qualifies as an "in terrorem" misuse of the statute. This is the exact behavior that sanctions are meant to deter. Plaintiffs' counsel further wasted the Court's time and resources by improperly submitting hundreds of pages of evidence attached to the FAC, which the Court was forced to sift through hunting for relevant information pertaining to the claims and the plaintiffs. Unfortunately, that was not assigned as a ground for sanctioning counsel in the safe harbor filing. Had it been assigned as a ground I would have awarded sanctions for the patently improper pleading used in this case, which has complicated both the making of the motion to dismiss and the Court's evaluation of that motion.

I am not imposing sanctions against the individual plaintiffs Scott W. Williams III and Matthew Philip Demaree. Nothing in the moving papers convinces me that they were not entitled to rely on their attorney's assessment of the viability of the RICO claim asserted in the FAC.

### D. **Appropriate Sanctions**

Rule 11(c)(4) states that "sanction[s] imposed under this rule must be limited to what suffices to deter repetition of the conduct . . . ." Fed. R. Civ. P. § 11(c)(4). Ordinarily an appropriate award is the amount of attorneys' fees incurred by defendants solely in connection with advancing the argument in their motion to dismiss for why the RICO claims should be dismissed. No other claim has been found to be frivolous; indeed, it appears that most if not all of the plaintiffs have stated individual claims for breach of contract, although many of those are doubtless time-barred under relevant law or are otherwise inadequate.

However, in this particular case the briefing on the RICO issues was not particularly helpful to the court. We had to conduct our own research on several points. I am not inclined to reward Defendants' counsel for work that was not useful.

I thus conclude that sanctions in the amount of $2,500 should be awarded to Defendants' counsel.

### CONCLUSION

For the reasons discussed above, the First and Second Causes of Action in the First Amended Complaint are dismissed with prejudice. All other causes of action are dismissed without prejudice.

Defendants' motion for sanctions is granted in part and denied in part.

The requests for an order to show cause and for limited discovery are dismissed as moot, as is the letter motion at Docket #61 seeking a conference.

This constitutes the decision and order of the court. It is a written decision. The Clerk of Court is directed to remove the motions at Dockets 25, 56 and 61 from the court's list of open motions, and to close this case.

Dated: October 4, 2023

U.S.D.J.

BY ECF TO ALL COUNSEL